No. 23-10181-JJ

In the
United States Court of Appeals
for the Eleventh Circuit

JOSE R. ROSADO,

*Plaintiff-Appellant,*

v.

CARLOS DEL TORO, SEC'Y OF THE NAVY,

*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 3:19-CV-01428-MMH-PDF

**BRIEF OF THE SECRETARY**

ROGER B. HANDBERG
United States Attorney

MICHELLE THRESHER TAYLOR
Assistant United States Attorney
Appellate Division

SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

June 27, 2023

*Jose R. Rosado v. Sec'y of the Navy*
No. 23-10181

**Certificate of Interested Persons
and Corporate Disclosure Statement**

In addition to the persons and entities identified in the certificate of interested persons and corporate disclosure statement in Jose Rosado's principal brief, the following persons have an interest in the outcome of this case:

1.  Angerer, Ronald P., Esq.;

2.  Hoppmann, Karin, former Acting United States Attorney;

3.  Kanupp, Samuel B., Esq.;

4.  Lopez, Maria Chapa, former United States Attorney;

5.  Rhodes, David P., Assistant United States Attorney, Chief, Appellate Division; and

6.  Thresher Taylor, Michelle, Assistant United States Attorney.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## Statement Regarding Oral Argument

Neither party requests oral argument. *See* Rosado's brief at 10.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement .........C-1

Statement Regarding Oral Argument ...............................................................i

Table of Contents ...........................................................................................ii

Table of Citations ......................................................................................... iv

Statement of Jurisdiction .............................................................................. vii

Statement of the Issues .................................................................................. 1

Statement of the Case..................................................................................... 1

    *Course of Proceedings* ............................................................................. 2

    *Statement of the Facts*.............................................................................. 5

      I.     First IT-specialist job (April 2014) ................................................6

      II.    Second IT-specialist job (December 2014)................................. 12

      III.   Non-competitive IT-specialist promotion (late 2014) ................. 20

      IV.   Offer of purported temporary position (August 2015) ............... 21

      V.    Supervisory IT-specialist job (November 2017) ......................... 24

*Standard of Review* ...................................................................................... 30

Summary of the Argument ........................................................................... 31

Argument and Citations of Authority........................................................... 31

I.      No reasonable juror could find that anyone in the
        Command Information Office discriminated against
        Rosado on the basis of age, race, or national origin, because
        there is no evidence that those characteristics played any
        role in the decision-making process for any selection ................ 33

        A.      Public-sector discrimination claims and *Babb* .................. 34

        B.      Summary Judgment after *Babb* ........................................ 37

        C.      The similarly situated comparator ................................... 40

        D.      There is no evidence that anyone treated Rosado
                differently that any similarly situated candidate for
                any available position ..................................................... 43

II.     No reasonable juror could find that anyone in the Command
        Information Office retaliated against Rosado, because there
        is no evidence that his EEO complaints were a but-for cause
        of differential treatment hat played a role in the decision-
        making process for any selection ............................................... 51

Conclusion .............................................................................. 58

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

# Table of Citations

## Cases

*Alvarez v. Royal Atl. Devs., Inc.*,
  610 F.3d 1253 (11th Cir. 2010) ................................................................ 51

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................ 32

*Babb v. Dep't of Veterans Affairs*,
  992 F.3d 1193 (11th Cir. 2021) ................................................ 34, 38–39, 53

*Babb v. Wilkie*,
  140 S. Ct. 1168 (2020) ....................................................................*passim*

*Bostock v. Clayton Cnty., Ga.*,
  140 S. Ct. 1731 (2020) ....................................................................... 34–35

*Brown v. Alabama Dep't of Transp.*,
  597 F.3d 1160 (11th Cir. 2010) ......................................................... 54–55

*Brungart v. BellSouth Telecommunications, Inc.*,
  231 F.3d 791 (11th Cir. 2000) ................................................................ 54

*Chapman v. AI Transp.*,
  229 F.3d 1012 (11th Cir. 2000) .............................................................. 50

*Cincinnati Ins. Co. v. Metro. Props., Inc.*,
  806 F.2d 1541 (11th Cir. 1986) ........................................................ 32, 43

*Drago v. Jenne*,
  453 F.3d 1301 (2006) .............................................................................. 55

*Gilmour v. Gates, McDonald and Co.*,
  382 F.3d 1312, 1314–15 (11th Cir. 2004) ............................................... 32

*Green v. Brennan*,
  578 U.S. 547 (2016) ................................................................................ 52

*Hornsby-Culpepper v. Ware*,
  906 F.3d 1302 (11th Cir. 2018) .............................................................. 38

iv

*Jenkins v. Nell*,
  26 F.4th 1243 (11th Cir. 2022).................................................31, 38, 40, 41

*Jones v. City of Birmingham*,
  No. 21-12962, 2022 WL 4393344 (11th Cir. Sept. 23, 2022) ..................... 43

*Lewis v. City of Union City*, *Ga.*,
  918 F.3d 1213 (11th Cir. 2019).........................................................40, 42

*Lewis v. City of Union City*, *Ga.*,
  934 F.3d 1169 (11th Cir. 2019)............................................................. 40

*Lewis v. Sec'y of U.S. Air Force*,
  No. 20-12463, 2022 WL 2377164 (11th Cir. June 30, 2022)........... 39, 42–43

*Malone v. U.S. Att'y Gen.*,
  858 F. App'x 296 (11th Cir. 2021).....................................................42–43

*Martin v. Fin. Asset Mgmt. Sys., Inc.*,
  959 F.3d 1048 (11th Cir. 2020)............................................................. 57

*Mulhall v. Advance Sec., Inc.*,
  19 F.3d 586 (11th Cir. 1994) ................................................................ 43

*Sapuppo v. Allstate Floridian Ins.*,
  739 F.3d 678 (11th Cir. 2014).........................................................53, 56

*Thomas v. Cooper Lighting, Inc.*,
  506 F.3d 1361 (11th Cir. 2008)............................................................. 54

*Tonkyro v. Dep't of Veterans Affairs*,
  995 F.3d 828 (11th Cir. 2021).........................................................33, 52

*Trask v. Dep't of Veterans Affairs*,
  822 F.3d 1179 (11th Cir. 2016)............................................................. 52

*Troupe v. DeJoy*,
  861 F. App'x 291 (11th Cir. 2021) ....................................................42–43

*Wascura v. City of South Miami*,
  257 F.3d 1238 (11th Cir. 2001)............................................................. 55

**Statutes**

28 U.S.C. § 1291 ............................................................. vii

29 U.S.C. § 633a ...................................................... vii, 3, 32

29 U.S.C. § 633a(a) ............................................................ 33

42 U.S.C. § 2000e .................................................... vii, 32

42 U.S.C. § 2000e–2(a) ................................................... 34

42 U.S.C. § 2000e–3 .......................................................... 52

42 U.S.C. § 2000e–16 ............................................... 3, 35, 37

42 U.S.C. § 2000e–16(a) ................................................ 33, 52

**Rules**

Fed. R. App. P. 4(a)(1)(B) ............................................. vii

Fed. R. Civ. P. 56(a) ........................................................ 32

## Statement of Jurisdiction

This is an appeal from a final decision of the United States District Court for the Middle District of Florida in a civil case. That court had jurisdiction. *See* 42 U.S.C. § 2000e; 29 U.S.C. § 633a. The court entered judgment on November 18, 2022, Doc. 59, and Rosado timely filed a notice of appeal on January 16, 2023, Doc. 65. *See* Fed. R. App. P. 4(a)(1)(B) (notice of appeal may be filed within 60 days if one of the parties is the United States). This Court has jurisdiction over this appeal. *See* 28 U.S.C. § 1291.

## Statement of the Issues

I.  Whether the district court correctly granted summary judgment on Rosado's discrimination claims because no reasonable jury could conclude that Rosado's age, race, or national origin had played a role in any of the challenged personnel actions, based on undisputed facts.

II.  Whether the district court correctly granted summary judgment on Rosado's retaliation claims because no reasonable jury could find a causal connection between Rosado's various EEO complaints and any subsequent adverse personnel action, based on undisputed facts.

## Statement of the Case

This is an employment-discrimination case. Rosado alleged that the Navy had discriminated against him due to his age, race, and national origin, and had retaliated against him, by failing to hire him for three vacant positions in his current office; by non-competitively promoting one his colleagues; and by failing to pay him for what he describes as a "temporary promotion." The district court granted summary judgment on all claims as explained below. On appeal, Rosado argues that the court erred by granting judgment on eight discrimination claims involving four of the personnel actions (counts I, II, III,

V, XI, XII, XIII, and XV), and by granting judgment on two retaliation claims involving the other personnel action (counts IX and XVII). He has abandoned his other claims by failing to address them in his brief (counts IV, VI, VII, VIII, X, XIV, XVI, and XVIII).

### *Course of Proceeding*

Rosado has been an IT specialist in the Command Information Office of the Navy Facilities Engineering Command Southeast in Jacksonville since 2007. *See* Doc. 36-1 at 2 (Rosado deposition); Doc. 5 ¶ 6 (amended complaint).[1] He is Hispanic and was born in 1957. Doc. 36-1 at 5. In 2011, 2014, 2015, and 2018, he filed four EEO complaints alleging unlawful age discrimination, sex discrimination, and retaliation. *See* Doc. 38-2 at 2 (EEO decision rejecting Oct. 14, 2011 claims); Doc. 38-3 (Dec. 10, 2014 complaint); Doc. 47-4 (EEO letter consolidating April 2015 claims with 2014 complaint); Doc. 38-4 (Mar. 19, 2018 complaint). The Navy's Equal Employment Opportunity Office ultimately rejected each claim. *See* Doc. 38-7.

In 2019, he sued in federal court under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16, and the Age Discrimination in Employment Act, 29 U.S.C. § 633a. *See* Doc. 1. He claimed that the Navy had discriminated

---

[1]We cite to page numbers in the ECF header for all documents on the district-court docket.

and retaliated against him by not selecting him for three IT-specialist positions between 2014 and 2018; by non-competitively promoting one of his colleagues in 2014; and by refusing to temporarily promote him (according to Rosado) in 2015. *See* Doc. 5 (amended complaint).

The parties exchanged discovery for almost two years. The Secretary deposed Rosado (Doc. 36-1) and submitted nine declarations from seven witnesses citing dozens of records relating to the challenged personnel actions (Docs. 37-1, 38-1, 51-1, 52-1, 53-2–53-6). Rosado submitted his own declaration and supporting documents (Doc. 47), and he deposed the command information officer in charge of his office (Doc. 35-1). When discovery was complete, the Secretary moved for summary judgment. *See* Doc. 34.

Rosado could not establish a prima facie case of discrimination, the Secretary argued, because there was no evidence that any comparable candidate (*i.e.*, similarly qualified) had been treated more favorably than Rosado—nor any differently at all—at any step of the selection process, for any position. *See* Doc. 34 at 17–28; Doc. 50 at 2–9. And he could not establish a prima facie case of retaliation because there was no evidence of a causal connection between (a) Rosado's EEO complaints and (b) any differential

treatment at any step of the selection processes. *Id*.[2]

Rosado argued that he had established a prima facie case for each claim. *See* Doc. 46 at 9–25. He did not argue—for instance—that there was a "convincing mosaic" of evidence of discriminatory intent, nor any other alternative to a prima facie showing. *Id*. He thus conceded that his claims could survive summary judgment only if he established the prima facie elements of each claim. *Id*. at 5–6 ("Plaintiff generally agrees with Defendant's argument regarding the elements of a prima face case" but disagrees "whether the evidence demonstrates a prima facie case."). To this end, Rosado argued that he was "equally or better qualified" than the candidates selected for the positions to which he had applied, and his colleague who had been promoted non-competitively (but he identified no similarly situated comparator for his own temporary promotion). *Id*. at 9–25.

"Consistent with the contentions of the parties," the district court "analyze[d] whether Rosado had established a prima facie case that supports

---

[2]Rosado says that "the Navy's summary judgment motion addressed only liability ... as opposed to the remedies available to Rosado." Rosado's brief at 42. That is incorrect. We argued that summary judgment should be granted on all claims, foreclosing all remedies, because there was no evidence that discrimination or retaliation played any role in the selection process for any position. *See* Doc. 34 at 17–18 (addressing *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), discussed below).

an inference of discrimination or retaliation." Doc. 58 at 17. In so doing, the court followed *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), and this Court's recent cases interpreting *Babb*. *Id.* at 11–18. Those cases hold that federal personnel decisions must be "untainted by any consideration" of age or race, whether or not it affects the ultimate decision. *Babb*, 140 S. Ct. at 1171. Applying *Babb* and this Court's precedent, the court found no evidence that any comparable candidate had been treated differently than Rosado and no evidence of a causal connection between his EEO complaints and any differential treatment. *Id.* at 18–54. Rosado therefore could not establish a prima facie case of discrimination or retaliation. *Id.* at 54. The court granted summary judgment for the Secretary. *Id.*

## Statement of the Facts

This lawsuit concerns Rosado's three unsuccessful applications for promotion or transfer, within the Command Information Office, to other IT positions, between 2014 and 2018. *See generally* Doc. 5. Rosado alleges that he was not selected for promotion or transfer each time because of his race, his age, or in retaliation for having opposed purported discrimination. *Id.* He also challenges an offer of temporary promotion and the non-competitive promotion of another employee. *Id.* The relevant circumstances of each personnel action are as follows.

5

## I.    First IT-specialist job (April 2014).

The first position for which Rosado unsuccessfully applied was an IT-specialist job advertised in April 2014 (vacancy #1082872). *See* Doc. 51-2 (announcement). We will refer to this as position I. Counts I, VI, and XI relate to this position. *See* Doc. 5.

The job posting stated that the chosen applicant would act as "the System/Networks Administrator for legacy, non-legacy, smart energy and Industrial Control Systems" in the Command Information Office. *Id*. Duties would include installing and configuring network servers, operating systems, routers, and switches; defining and maintaining network architecture and infrastructure; conducting on-site visits for installation, network administration, and support of IT systems (including industrial control systems); and implementing system security procedures, tools, and policies. *Id.* at 2. The following "specialized experience" was required: (1) applying design and architecture principles and concepts; (2) installing complex, new, and modified hardware, operating systems, and application software; (3) troubleshooting network problems; and (4) developing and implementing configuration management plans for complex local and wide-area networks. *Id.*

The job posting also stated that applicants must either possess, or obtain

6

within 24-months of their selection, an Information Technology Career Field certification as per the Defense Acquisition Workforce Improvement Act. Doc. 51-2 at 2. (We will refer to this requirement as "DAWIA certification"). Rosado was DAWIA level-2 certified and said so on his resume. *See* Doc. 47-11 at 3. He met the minimum requirements and was eligible to be considered for position I. *See* Doc. 47-2 at 1 (notification that Rosado's application had been referred for consideration).

Rosado's application was referred to the selection committee. Doc. 47-2 at 1. The committee consisted of Rosado's direct supervisor at the time, Jeff Kohler; two other voting members; and a non-voting EEO representative. *See* Doc. 36-1 at 5 (Rosado deposition); Doc. 53-2 at 3–4 (declaration); Doc. 53-3 at 3 (declaration). Kohler was the chair. *See* Doc. 53-2 at 3; Doc. 51-1 ¶ 4 (declaration). Each voting member separately reviewed the resumes of the 17 eligible candidates and scored them individually across five domains: operating-systems experience (30%); network-administration experience (20%); switch and router experience (20%); industrial-control-systems experience (10%); and wireless-networking experience (20%). *See* Doc. 51-5 (scoresheet); Doc. 53-3 at 3 (declaration). Pre-established criteria gave preference to more recent experience in each area. *See* Doc. 51-3 at 1–2. The criteria specified that full credit should be awarded only for experience within the past two years. *Id.*

7

Little or no credit should be awarded for experience more than three years old. *Id*.

Although Rosado satisfied the minimum requirements stated in the job posting, most of his relevant experience was not recent. For instance, Rosado's resume indicated that he had some prior experience with wireless networking, switches, and routers, but it had been at least seven years earlier, in a previous job. *See* Doc. 47-11 at 3–5 (system administrator from 2004–2007). His current position—which he had held for seven years—involved none of those things. *See* Doc. 47-11 at 2–3. It did involve some work with operating systems and network administration, but those responsibilities seemed secondary to telecommunications, according to Rosado's resume. *Contrast* Doc. 51-2 at 2 (job posting) *with* Doc. 47-11 at 2–3 (resume). Rosado was part of the "telecommunications services" group within the Command Information Office, separate and apart from the "network services" or "enterprise support" groups. *See* Doc. 37-5 (org chart). A division director explained that Rosado primarily dealt with "cell phones and telephone networks and systems." Doc. 52-1 ¶ 22 (declaration). Rosado's resume showed that, "in comparison to the other candidates," "he did not have as much *recent* significant experience" that would be relevant to a system- and network-administrator position, as one of the committee members explained. Doc. 53-3 at 6 (declaration, emphasis

added).

Following the pre-established criteria, the voting committee members awarded Rosado's resume an average of 5.00 points out of 20 for wireless experience; 0.67 points out of 10 for industrial-control-systems experience; 5.00 points out of 20 for switch and router experience; 8.33 points out of 20 for network-administration experience; and 10.00 points out of 30 for operating-system experience. Doc. 51-5; *see* Doc. 53-3 at 3–4 (committee member explaining Rosado's scores). Notably, each member gave uniform scores for industrial-control-systems (ICS) experience. Kohler and one other member gave all resumes zero points for ICS, while the third member gave all resumes two points for ICS. Doc. 51-5. Rosado's total average score was 28.99 points out of 100—11th among the 17 eligible candidates. *Id*. He was not selected to interview.

The committee at first invited the four candidates with the best resume scores to interview (43.00–55.67 points), but two declined and two turned the job down after being interviewed. *See* Doc. 51-6 at 2 (recommendation); Doc. 51-1 at 3–4 (declaration); Doc. 53-2 at 3–5 (declaration); Doc. 53-3 at 3–6 (declaration). The committee then invited the next five highest-scoring candidates to interview (37.33–39.67 points), but two of them likewise declined. *See* Doc. 53-3 at 3. Three interviewed. *Id*. One of them—Lewis

Fleming—had the highest remaining resume score (39.67), the highest interview score of all (57.67), and the highest remaining combined score (97.33). Doc. 51-5.

Fleming's resume score was more than 10 points higher than Rosado's (a 37% difference), mainly because Fleming had more relevant experience in the most significant area: operating systems (accounting for 30% of the total resume score). *See* Doc. 51-7 at 1–4 (Fleming's resume); Doc. 51-5 (scoresheet); Doc. 51-1 ¶ 5 (declaration); Doc. 53-3 at 3–4 (declaration). The committee members awarded Fleming's resume an average of 20.00 points out of 30 for operating-systems experience, compared to the 10.00 points that Rosado received. *See* Doc. 51-5. Aside from operating-systems experience, Rosado slightly outscored Fleming on network administration (8.33 to 7.33 points); Fleming slightly outscored Rosado on wireless networking (6.67 to 5.00 points); and the two received the same average scores for switch and router experience (5.00 points) and industrial-control-systems experience (0.67 points). Doc. 51-5. Fleming was not DAWIA certified, but the job posting stated that that was not a requirement (the selectee would have two years to obtain certification), and it had no bearing on resume or interview scores. *See* Doc. 51-2 at 2 (job posting); Doc. 53-3 at 3 (voting committee member: "DAWIA and Security Plus certifications were not part of the selection criteria

10

... .").

On August 4, 2014, the committee unanimously recommended both Fleming and the candidate with the next highest combined score. *See* Doc. 51-6 at 1 (recommendation); Doc. 53-3 at 6 (declaration). The selecting official chose Fleming. *See* Doc. 51-1 ¶ 4 (declaration).

Rosado learned in September 2014 that he had not been selected. *See* Doc. 36-1 at 22, 25; Doc. 47-1 ¶ 5; Doc. 47-2. On December 10, 2014, he filed a formal complaint alleging that he had been passed over for position I due to his age, race, and national origin (discrimination), as well as his previous opposition to purported discrimination (retaliation). *See* Doc. 38-3 at 2.

On September 26, 2014—just four days after Fleming had started— Kohler unexpectedly passed away. Doc. 37-1 ¶ 15 (declaration). Kohler had been Rosado's direct supervisor and the chair of the selection committee for position I. *See* Doc. 36-1 at 5 (Rosado deposition); Doc. 51-1 ¶ 4 (declaration of command information officer). The same day, Rosado asked the command information officer (his second-level supervisor) to "debrief" him on the selection process for position I. *See* Doc. 37-1 ¶¶ 10–14; Doc. 37-2 at 2 (e-mail). The command information officer was new; she had assumed her position about three weeks earlier. Doc. 37-1 ¶ 1. Nevertheless, later that morning, she "provided the entire staff with a general overview of the selection process," in

11

response to Rosado's request. Doc 37-1 ¶ 15; *see also* Doc. 37-2 at 2. Rosado, however, wanted to know "where [he] fared in the process compared to those that met the 'criteria writer's' expectations," including "the criteria itself [sic], if possible." Doc. 37-2 at 1; *see also* Doc. 37-1 ¶ 15. The command information officer told Rosado that she could not provide that information because she had not been privy to the selection process. *See* Doc. 37-1 ¶ 15; Doc. 37-2 at 1. She later advised Rosado to direct his request to the division director, instead. *See* Doc. 37-1 ¶ 15. The record does not indicate whether Rosado did so.

## II.    Second IT-specialist job (December 2014).

The second position for which Rosado unsuccessfully applied was an IT specialist job advertised in December 2014 (vacancy #1276490). *See* Doc. 47-7 (announcement). We will refer to this as position II. Counts II, VII, and XII relate to this position. *See* Doc. 5.

Three such positions were initially available in the operational-technology division. *See* 37-1 ¶ 25 (declaration). (The operational-technology division is known as "CIO4." *See* Doc. 37-5 (org chart). The information-technology division is known as "CIO3." *Id.*) The job posting for position II stated that the chosen applicant (or applicants) would share their "knowledge and experience in coordinating and integrating technical aspects of computer work with administrative matters such as standards management, acquisition

12

and configuration management, Information Technology (IT) security and risk management." Doc. 47-7 at 1. Duties would include (1) installing, testing, operating, troubleshooting, and maintaining hardware and software systems; (2) performing system administration; (3) interpreting and applying policies, processes, and guidelines; (4) analyzing and designing systems and applications; and (5) implementing system security procedures, firewalls, host/client access, file permissions, and user accounts. *Id.* at 2. The following "specialized experience" was required: (1) applying information management and technology policies; (2) performing software upgrades and backup/recovery procedures; (3) managing IT equipment; and (4) configuring network servers, operating systems, firewalls, routers, and switches. *Id.* at 2–3.

Rosado had done much of this, to varying degrees, at various times, in the previous ten years—but not recently. *See* Doc. 47-11 at 2–4 (Rosado's resume). This job posting likewise stated that applicants must either be DAWIA certified (which Rosado was) or obtain certification within 24-months of their selection. Doc. 47-7 at 3; Doc. 47-11 at 3 (Rosado's resume). Rosado met the minimum requirements, again, and was eligible to be considered for position II. *See* Doc. 37-4 at 5 (cert list).

One of the three vacant operational-technology IT-specialist positions was filled by non-competitive promotion, around the time that position II was

13

announced. *See* Doc. 37-1 ¶¶ 24–27. (More on that below.) The command information officer—who was the selecting official—appointed the division director to lead a committee to recommend two more candidates, under the position II announcement. *Id.* ¶ 27. The division director, in turn, selected three additional voting committee members and a non-voting EEO member. Doc. 37-1 ¶¶ 27, 31 (declaration).

This time, 40 eligible candidates had applied (compared to 17 eligible candidates for position I). *See* Doc. 37-4 at 1–7 (cert list). Because of the large number of applicants, the division director pre-screened the eligible resumes "for other relevant technical experience directly related to [industrial control systems]," in order to "reduce the pool of candidates to a manageable number for the panel members to review." Doc. 52-1 ¶ 14 (declaration). He determined that the following types of experience would be particularly useful for this position: (1) advanced metering infrastructure; (2) programming language controls; (3) supervisory control and data acquisition (4) dynamic delta controls; (5) industrial control systems; (6) Enclave (a network utility); and (8) public safety network. *Id.* ¶ 14. He ranked all 40 resumes based on these criteria and referred five of the best candidates to the full committee. *Id.*[3]

---

[3]He excluded two of the top seven candidates because one had recently been promoted to the same position (the non-competitive promotion

Rosado again did not make the cut. Beyond his general experience with networking and systems administration in his previous job, Rosado's resume did not mention the particular things that the division director sought for this position. *See* Doc. 47-11 at 2–5 (resume); Doc. 52-1 ¶ 22 (explaining Rosado's lack of relevant experience). Moreover, most of Rosado's systems-administration and networking experience was not recent; he had dealt primarily with telecommunications (i.e., cell phone and telephone networks) for the past seven years. *Id*. Rosado had stated in response to a job questionnaire that he had unspecified experience with industrial control systems (Doc. 47-12 at 2–3), but the division director would not have received those responses—only his resume. *See* Doc. 51-1 ¶ 15 (command information officer explaining that the questionnaire "is used by [human resources]" to compile the certified list of eligible candidates; it is "not included in the resume package" provided to the reviewing official). The job posting had advised applicants: "[Y]our resume is the key means we have for evaluating your skills, knowledge, and abilities," and "your resume must provide sufficient experience and/or education, knowledge, skills, and abilities to perform the [required] duties." Doc. 47-7 at 2. Accordingly, Rosado "did not score enough points to put him in the top ten candidates" for position II. Doc. 52-1 ¶ 22.

---

mentioned above), and another did not want to relocate. *See* Doc. 52-1 ¶ 14.

Neither his score nor precise rank are in the record. In any event, the division director had been "a little surprised" that Rosado had applied for position II, because he had once rejected an offer to be "trained on servers" and transfer to the operational-technology group. *Id.* ¶ 20. In fact, Rosado had refused to "talk with [the director] when he approached him about the cross-training opportunity." Doc. 37-1 ¶ 39 (declaration).

The selection committee reviewed and scored the five resumes that the division director referred. Doc. 52-1 ¶ 15 (declaration).[4] Unfortunately, their top three candidates withdrew before or after interviews. *Id.* ¶ 16. By now it was March 2015. *Id.* The certified list of candidates was about to expire. *Id.* ¶ 17. The division director and command information officer were concerned about the office's increasing workload. *Id.* They hoped to fill positions quickly, without resoliciting applications (which would be time consuming). *Id.* The command information officer instructed the division director to send her the resumes of the remaining top-ten candidates. *Id.* ¶ 18.

Only two of those ten were still available: Greg Snead and Anthony Joshua. Doc. 52-1 ¶ 18. The other candidates had withdrawn from

---

[4]When asked to compare the selectees' scores to Rosado's scores "on the resume review," the command information officer said that Rosado's score "was 0." Doc. 47-5 at 5. His resume, of course, had not been referred for review, as explained above.

consideration. *Id.* The committee had ranked Snead's resume fourth of the five that the division director had referred. *Id.* ¶ 19. The division director had ranked Joshua's resume ninth of the 40 resumes that he had pre-screened (the committee therefore had not considered Joshua). *Id.* ¶ 20. All other top-10 candidates had withdrawn. *Id.* ¶ 18. Rosado was not in the top-ten for the reasons above. *Id.* ¶ 22.

The division director explained that Snead and Joshua were sufficiently qualified and the best remaining candidates. *See* Doc. 52-1 ¶¶ 19–23 (declaration). Although Snead had little experience with industrial control systems, he had "good network experience." *Id.* ¶ 19. His resume, like Rosado's, did not specifically mention the particular skills that the division director had initially sought, *see* Doc. 52-4 (Snead's resume), but Snead's experience as a network and systems administrator was current, unlike Rosado's, *see* Doc. 52-1 ¶¶ 19, 21.

Joshua's resume likewise showed "good, current systems and networking experience," although he, too, lacked significant industrial-control-systems experience. Doc. 52-1 ¶ 21 (declaration); *see* Doc. 51-12 (resume). From 2009 to present, Joshua had provided technical support for new accounts, network connectivity issues, printing problems, and e-mail problems. Doc. 51-12 at 1. He had also installed new PCs and laptops, migrated data,

17

and configured user settings. *Id.* The division director particularly valued Joshua's experience with Microsoft Servers, workstations, switches, and routers, all of which also appeared on his resume. Doc. 52-1 ¶ 21; Doc. 51-12.

The division director recommended that Joshua and Snead be hired promptly, without interviews, in light of the division's urgent needs. Doc. 52-1 ¶¶ 19, 21 (declaration); Doc. 37-1 ¶¶ 38–40 (declaration). The command information officer agreed. Doc. 52-1 ¶¶ 19, 21; Doc. 37-1 ¶¶ 38–40. She hired both on March 15, 2015, the day before the certified list of candidates expired. Doc. 37-1 ¶ 40. The command information officer feared that, if she had not selected Joshua and Snead, it would have taken six to nine months to resolicit and hire new applicants. *Id.*

Rosado learned that he had not been selected for position II on or about April 7, 2015. *See* Doc. 5 ¶ 22. On April 13, he amended his previous EEO complaint to also allege that he had been passed over for this position, too, due to discrimination and retaliation. *See* Doc. 47-4 at 2. And he further alleged that his command information officer had discriminated and retaliated against him by "berating" him in a group meeting on April 1, 2015, unrelated to position II or any other personnel action. *Id.* at 1. Rosado claims that the command information officer made "eye contact" with him and another employee while admonishing everyone at the meeting. Doc. 36-1 at 20–21

18

(Rosado's deposition). He admits that the admonishment was in response to the other employee (Fleming) having refused to perform a task that someone had asked him and Rosado to perform (shipping something to Cuba). *Id*. The command information officer admits admonishing the group but denies singling out Rosado or anyone else. *See* Doc. 35-1 at 5 (her deposition). She explained that she had "received an e-mail from the acting … division director indicating that there were staff members that had refused to do work." *Id*. She intended to convey to everyone that "[i]f you want to go over and talk to the EEO" about the scope of your position, "that's okay because that's what we do," and "[w]e're following the process." *Id*. This is how the command information officer described her statement, in which she invited her staff to raise concerns with the EEO or union:

> I addressed the entire CIO staff and told everyone—without singling out any one person and being very careful to avoid making eye contact with any one person—that (1) this organization is bigger than any one individual including myself. People should not have to 'walk around on eggshells' because they are afraid that what they say or do can be misrepresented by someone else. (2) We have all worked really hard to change the climate of this organization. People are happy to come to work and the stress and tension in the air is no longer present. If you don't want to work, the door is open for you to leave if you so desire. I feel very confident that what I have done is for the good of the organization and that you are all much happier than you were before I came so I'm not afraid of the EEO or the union if anyone wants to get them involved. Bring it on, because I'm sure they will understand that I am not asking anyone to work outside the scope of their PD.

19

Doc. 37-1 ¶ 44 (declaration).

In May 2015, at the command information officer's behest, the division director offered to debrief Rosado on the position-II selection process and to help with his resume. Doc. 52-1 ¶ 24; Doc. 37-1 ¶ 48. The command information officer hoped that this would "assist Mr. Rosado with applying for future positions." *Id*. Rosado initially accepted and met with the director to discuss his resume. Doc. 52-1 ¶ 24. The director suggested that Rosado change certain outdated terminology and add certain relevant experience that he had omitted. *Id*. When the director began to compare Rosado's resume to the position-II announcement, however, Rosado said that he "did not want to discuss this" and "abruptly ended the meeting." *Id*.

## III.   Non-competitive IT-specialist promotion (late 2014).

Rosado also objects that one of his colleagues, Leon Ravenscroft, was non-competitively promoted to one of the vacant IT-specialist positions in the operational-technology division, shortly after position II was advertised. Counts III, VIII, XIII, and XVI relate to Ravenscroft's promotion. *See* Doc. 5. Ravenscroft had been working in the Command Information Office on a term appointment scheduled to end in June 2016. *See* Doc. 37-1 ¶ 24 (declaration). He was qualified to work in the operational-technology division because he

20

had experience with industrial control systems and had previously run a company that performed ICS work. *Id*. And he was eligible to be converted from term to permanent appointment, without competition, because he was a disabled veteran with creditable military service. *Id*.; *see also* Doc. 51-8 at 1–2 (e-mail and letter regarding Ravenscroft's disability). Rosado concedes that Ravenscroft was eligible to be promoted non-competitively "pursuant to agency policy." Rosado's brief at 28 n.6. In November or December 2014, the command information officer informed human resources that she wanted to convert Ravenscroft. Doc. 37-1 ¶¶ 24–26. In February 2015, Ravenscroft was converted and appointed to one of the vacant IT-specialist positions in the operational-technology division. *Id*. ¶ 32. We will refer to this as position III.

## IV.   Offer of purported temporary promotion (August 2015).

Rosado also takes issue with what he characterizes as a "temporary promotion" that he says went uncompensated or unfulfilled. Counts IV, IX, XIV, XVII relate to the temporary promotion. *See* Doc. 5. We will refer to this as position IV, but this was a miscommunication, not a "promotion," because Rosado declined when his command information officer offered it.

In August 2015, in anticipation of an upcoming mediation for Rosado's pending EEO claims, the command information officer instructed Rosado's supervisor—the director of the information-technology division—to find out if

21

Rosado "would be receptive to being offered a temporary promotion to GS-12 in order to gain experience, which would enable him to add ... to his resume and allow him to be a more competitive candidate for a future promotion." Doc 37-1 ¶ 49 (declaration); *see also* Doc. 35-1 at 11–12 (deposition). The intention was to "allow him to gain experience as a GS-12" and "get his resume updated in hopes that that would ... help with [future] recruitment efforts." Doc. 35-1 at 12. The command information officer "did not ask or authorize[]" the director to *offer* Rosado a temporary promotion; merely to gauge his potential interest. Doc. 37-1 ¶ 49; *see also* Doc. 35-1 at 12. Nevertheless, the director offered Rosado what the director described as a "cross training and temporary promotion," potentially starting in September 2015. Doc. 37-1 ¶ 50; *see also* Doc. 47-14 at 2 (director's declaration admitting that he did "offer [the job] to [Rosado] as alleged"), Doc. 37-7 (director's e-mail to Rosado). This was not a "true promotion," however. *See* Doc. 51-1 ¶¶ 25–26 (declaration). The director did not have the power to "promote" Rosado, temporarily or otherwise. Doc. 35-1 at 12. The temporary "promotion" that the director offered was, in essence, a "detail" to an occupied GS-12 position, to fill in for a colleague who would be out for training. Doc. 51-1 ¶ 25. A detail is not a "true promotion" because it "does not come with an increase in salary" and "paperwork does not have to be

submitted to [human resources]." *Id.* ¶ 26. Rosado's director had authority to detail him. *Id.* A "true" temporary promotion, by contrast—which the director could not have offered—would have "come[] with an increase in salary commensurate with the higher grade promotion." *Id.* Rosado apparently understood his director's offer as a true temporary promotion (which the command information officer had not yet authorized). *See* Doc. 36-1 at 35 (Rosado's deposition). In this sense, "[it] was an idea that got passed [along] and was never approved." Doc. 35-1 at 12. Rosado ended up "providing coverage" for his colleague, as his director had proposed, consistent with a detail. Doc. 47-14 at 2. Rosado never asked his command information officer about "being compensated" for this assignment. Doc. 36-1 at 38 (Rosado's deposition).

The command information officer herself later offered Rosado a true temporary promotion (with a concomitant raise) at mediation. Doc. 35-1 at 12. Rosado declined, however, saying that "he had been offered the same thing by his supervisor." *Id.*[5] He claimed that he had already accepted the director's

---

[5]In fact, Rosado's director had proposed a detail, not a true temporary promotion, as explained above. *See* Doc. 51-1 ¶ 25 (command information officer's supplemental declaration). The temporary promotion that the command information officer proposed at mediation would have been a "true" temporary promotion "to a vacant GS-12 position," with GS-12 pay. *Id.*

offer, by "[sending] him my resume like he asked me [to do]." Doc. 36-1 at 35–
36 (Rosado deposition); *see* Doc. 37-7 (e-mail from director requesting resume).
The command information officer explained to Rosado that "even if [his
director] had made such an offer, [he] had no authority to do so because the
necessary approvals and authorizations had not been obtained." Doc. 37-1 ¶
51. Nevertheless, Rosado refused the command information officer's offer
because he did not want to compromise his EEO claims. Doc. 36-1 at 35
(Rosado's deposition). He remained in the same position, at the same salary (a
GS-11 IT specialist, *see* Doc. 37-5)—though voluntarily "detailed" as explained
above—until June 2016, when the command information officer permanently
promoted him into a new GS-12 vacancy within his division. *See* Doc. 37-1 ¶¶
61–62 (command information officer's declaration).

**V.    Supervisory IT-specialist job (November 2017).**

The final position for which Rosado unsuccessfully applied was a
supervisory IT-specialist job advertised in November 2017 (announcement
#ST-10082304). *See* Doc. 5 (Counts V, X, XV, XVIII); Doc. 37-8
(announcement). We will refer to this as position V. The job posting stated that
the chosen applicant would be the new director of Rosado's division
(information technology). Doc. 37-8 at 2; Doc. 37-1 ¶ 64 (command
information officer's declaration). Duties would include (1) supervising the

information-technology staff; (2) managing "the NMCI contract to ensure continuous services and availability of the NMCI network"; (3) communicating technical issue and problems to users and senior leadership; (4) evaluating the impact of new guidance on current programs and advising on potential effects and future IT requirements; and (5) providing leadership, guidance, and advice to managers and employees. Doc. 37-8 at 2. At least one year of the following types of "specialized experience" at the GS-12 level was required: (1) applying project management principles, methods, and practices in the planning and delivery of IT and/or telecommunications services; (2) providing expert technical advice, guidance, and recommendations to management on IT network and telecommunications issues and policies; or (3) applying advanced IT principles, concepts, methods, and standards to define, design, and improve project, program, and service management processes pertaining to network and telecommunications services. *Id.* at 3. This job posting—like the others—said that the selectee must obtain DAWIA certification within 24 months, if not already certified (which Rosado was). *Id.* at 3; Doc. 51-18 at 1, 6. Rosado had been at the GS-12 level for more than a year now, he met the minimum requirements stated in the announcement, and he was eligible to be considered for position V. *See* Doc. 37-1 ¶ 67 (command information officer's declaration).

25

The command information officer appointed another selection panel, this one chaired by the director of the operational-technology division. *See* Doc. 37-1 ¶ 65. This selection process began with pre-screening resumes, like position II, but ended with interviews, a recommendation, and selection, like position I. First, the command information officer pre-screened the 79 eligible resumes to reduce them to a manageable number for the panel. *Id.* ¶ 67. This time, Rosado made the first cut. *Id.* He had submitted a new resume for this position. *See* Doc. 51-18. It more clearly emphasized the systems-administration and networking aspects of his job in the telecommunications division. *Id.* The command information officer referred his resume and 20 others to the selection panel. Doc. 37-1 ¶ 68.

Second, the operational-technology director and two other panelists graded each resume in the following categories: (1) management experience (people, projects, and resources); (2) technical experience (tech refresh, life-cycle management, system/product requirements, telecommunications, and IT hardware); (3) network experience (routers/switches/hubs, system analysis, network design and administration, and network connectivity and performance); (4) policy and planning experience (IT policy development, strategic planning, long-range planning, command instruction development, and budgeting); and (5) certifications and education. Doc. 37-1 ¶¶ 68–69; *see*

26

*also* Doc. 52-1 ¶ 29 (director's declaration). Up to five points were available in each category, for a maximum of 25 total points. *See* Doc. 37-1 ¶ 69 (command information officer's declaration); Doc. 52-1 ¶ 29 (director's declaration). Each panelist graded each resume. *Id.* The scores in each category were weighted (management 30%; technical 20%; network 15%; policy and planning 25%; certifications and education 10%), then added together and normalized to produce a total resume score between 0 and 100. *See* Doc. 52-6 at 1–2 (resume scores).

Following these criteria, the three voting committee members awarded Rosado's resume an average of 2.33 points for management experience; 4.00 points for technical experience; 3.67 points for network experience; 1.67 points for policy and planning experience; and 1.00 point for certifications and education. *See* Doc. 52-6 at 2. After weighting the categories, adding, and normalizing, Rosado's total resume score was 51.34 points (out of 100)—12th among the 21 resumes that the command information officer had referred to the panel. *Id*.

Finally, the panel interviewed nine of the candidates with the 12 best resume scores (51.34–79.67), including Rosado. *See* Doc. 52-1 ¶ 32 (director's

declaration); Doc. 52-6 at 4 (interview scores).[6] They asked the same questions of each candidate. *See* Doc. 53-5 at 6–10 (identifying and explaining some questions); Doc. 37-1 ¶ 71. Each panelist graded each candidate's responses separately. *See* Doc. 52-1 ¶ 33; Doc. 52-6 at 4.

Rosado's interview did not go very well. Each panelist gave him the same score: just 56 points out of 100. *See* Doc. 52-6 at 4. He was sixth among nine interviewees. *Id.* The highest scoring interviewee—Joshua (one of the position-II selectees)—received an average of 79.33 points. *Id.*

One panelist testified that Rosado "did not perform well" because he "was very short on his responses and he did not fully answer all the questions." Doc. 53-4 at 6–7. Another panelist explained that Rosado "did not talk or speak about his experience"; he "was very short winded" and responded several times, "It's in my resume." Doc. 53-5 at 6–7. "He really did not answer [some] questions." *Id.* at 7. Some of Rosado's responses were "very vague." *Id.* at 6.

Joshua, on the other hand, "stood out with the best interview of all candidates." Doc. 53-4 at 6. He "talked a little bit more about his experience"

---

[6]The panel at first invited the top 10 candidates to interview, then extended invitations to the 11th and 12th candidates when two of the top 10 did not respond. *See* Doc. 52-1 ¶ 32; Doc. 37-1 ¶ 70. One candidate scheduled an interview but did not show up. *See* Doc. 53-4 at 6.

and "hit on skills," "expanding" and going "above and beyond" in his responses. Doc. 53-5 at 6. One panelist gave Joshua 20 points out of 20 for a particularly good response in which he spoke about listening, "being apologetic[]," and the "employees' point of view." *Id*. at 7. Joshua "interviewed well and he show[ed] his eagerness and ... his experience in this position." *Id*.

Importantly, Joshua had recent management experience that Rosado lacked. Joshua had volunteered to serve as the temporary director of the information-systems division, supervising eleven employees for nearly four months. *See* Doc. 51-1 ¶ 34 (declaration); Doc. 37-5 (org chart showing "CIO1"). And his project management experience included "technical refresh of laptops, network file share migration, and Windows 10 upgrades for the entire command." Doc. 51-1 ¶ 36. In grading Joshua's resume, the panel had awarded an average of 4.33 points out of 5 for his management experience—the most important category—compared to just 2.33 points for Rosado's management experience. *See* Doc. 52-6 at 1–2. One panelist explained that he had awarded Joshua's resume five points for management experience because "he had ... people experience, project experience, and resources management [experience]." Doc. 53-5 at 4–5. Owing significantly to his advantageous management experience, Joshua had the fifth highest overall resume score (out

29

of 21) to go along with his leading interview score. Doc. 52-6 at 1, 6. Rosado had the 12th highest resume score and sixth highest interview score. *Id.* at 2, 6.

The panel gave 40% weight to resume scores and 60% weight to interview scores, resulting in total combined scores of 53.33–74.67 for the nine interviewees. *See* Doc. 52-6 at 6. Joshua had the second highest combined score (73.73). *Id.* Rosado had the second lowest combined score (54.13). *Id.* The panel unanimously recommended Joshua over the candidate with the slightly higher combined score (74.67), because Joshua had specialized "corporate knowledge" with particular systems that the information-technology division used. Doc. 52-1 ¶ 34 (declaration). The command information officer accepted the panel's recommendation. *See* Doc. 37-10. She publicly announced Joshua's selection as the new information-technology director (position V) in February 2018. *See* Doc. 37-12 (e-mail). Rosado promptly contacted an EEO counselor and, in March 2018, filed a formal complaint alleging that he had not been selected for position V, like the other positions, due to discrimination and retaliation. *See* Doc. 38-4 (complaint).

## Standard of Review

This Court reviews de novo a district court's order granting summary judgment, viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party. *See, e.g., Jenkins v. Nell*, 26 F.4th 1243, 1249

(11th Cir. 2022).

## Summary of the Argument

I.    The district court correctly granted summary judgment on Rosado's discrimination claims. No jury could reasonably conclude that the Navy discriminated against Rosado based on his race, age, or national origin, because there is no evidence that any otherwise comparable candidate was treated more favorably than Rosado at any step of the decision-making process for any position. Undisputed evidence shows that the putative comparators that Rosado identifies had determinative qualifications that Rosado lacked, such as recent experience with operating systems, networking, systems administration, or management. No material facts are in dispute.

II.    The district court correctly granted summary judgment on Rosado's retaliation claims. No jury could reasonably conclude that the Navy retaliated against Rosado for having opposed discrimination because there is no evidence of any causal connection between his EEO complaints and any aspect of the selection process for any position. In any event, Rosado has abandoned all but one of his retaliation claims.

## Argument and Citations of Authority

Summary judgment helps to "define disputed facts and issues," "dispose of unmeritorious claims," and promote "efficiency and judicial economy."

31

*Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314 –15 (11th Cir. 2004). The court should grant summary judgment when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When a defendant moves for summary judgment, the question is whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252. The "mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough to defeat the motion; "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–52. Contentions based on "mere speculation and conjecture" cannot defeat summary judgment. *Cincinnati Ins. Co. v. Metro. Props., Inc.*, 806 F.2d 1541, 1544 (11th Cir. 1986).

The substantive law underlying a plaintiff's claims determines which facts are material at the summary-judgment stage. *Anderson*, 477 U.S. at 248. No material facts are in dispute here. Rosado sought relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq, and the Age Discrimination in Employment Act, 29 U.S.C. § 633a. *See* Doc. 5 (amended complaint). We begin with his discrimination claims.

**I.    No reasonable juror could find that anyone in the Command Information Office discriminated against Rosado on the basis of age, race, or national origin, because there is no evidence that those characteristics played any role in the decision-making process for any selection.**

Title VII prohibits private employers and the federal government alike from discriminating against employees based on protected characteristics. The public-sector provision—relevant here—states that "[a]ll personnel actions affecting employees or applicants for employment ... in executive agencies ... *shall be made free from any discrimination based on race, color, religion, sex, or national origin.*" 42 U.S.C. § 2000e–16(a) (emphasis added). The ADEA contains a virtually identical public-sector provision, prohibiting discrimination based on age in "personnel actions affecting employees or applicants ... who are at least 40 years of age." 29 U.S.C. § 633a(a). Until recently, courts had "generally assumed that [the] federal-sector provision[s] [were] intended to make Title VII [and the ADEA] applicable in the federal workplace to the same extent that [they were] already applicable in the non-federal workplace." *Tonkyro v. Dep't of Veterans Affairs*, 995 F.3d 828, 833 (11th Cir. 2021) (internal quotation marks and citation omitted). That assumption had led courts to overlook "significant textual differences" between the public- and private-sector provisions. *Id.*[7]  The

---

[7]Title VII's private-sector provision, in contrast, states that "it shall be an

Supreme Court addressed those differences in *Babb v. Wilkie*, 140 S. Ct. 1168 (2020). Although *Babb* involved the Age Discrimination in Employment Act ("ADEA"), this Court has held that the standard articulated in *Babb* also "controls cases arising under Title VII's nearly identical text." *Babb v. Dep't of Veterans Affairs*, 992 F.3d 1193, 1196 (11th Cir. 2021). Accordingly, the same standard applies to Rosado's Title VII claims and his ADEA claims.

## A.    Public-sector discrimination claims and *Babb*.

*Babb* affected two aspects of public-sector employment-discrimination claims (Rosado also brings retaliation claims, discussed below). First, *Babb* makes clear that "but-for" causation governs. *Babb*, 140 S. Ct. at 1177–78. "That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739–40 (2020) (involving Title VII's private-sector discrimination provision). "In other words, a but-for test directs us to change

---

unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's race, color, religion, sex, or national origin*, or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, *because of such individual's race, color, religion, sex, or national origin.*" § 2000e–2(a) (emphases added).

one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* While an outcome may have multiple but-for causes—like a car accident caused by one driver running a red light and by another driver failing to signal at the intersection—a "but-for cause" is more than a mere "motivating factor." *Id.*

Second, *Babb* holds that section 2000e–16 broadly prohibits discrimination in the federal-employment-decision-making process, *whether or not it affects the ultimate decision.* "The plain meaning of the critical statutory language ('made free from any discrimination based on [protected characteristics]') demands that personnel actions be untainted by any consideration of [those characteristics]." *Babb*, 140 S. Ct. at 1171. "If, at the time when the decision is actually made, age"—(for instance)—"plays a part, then the decision is not made 'free from' age discrimination." *Id.* at 1174 n.3. Accordingly, a federal employee can obtain certain relief under the ADEA or Title VII by showing that a protected characteristic was the "but-for cause of differential treatment in an employment decision," even if it was not a but-for cause "of the decision itself." *Id.* at 1178.

That does not mean, however, that the consequences of discrimination are irrelevant. The consequences, or lack thereof, bear on remedy. An employee or applicant who "cannot show that discrimination was a but-for

cause of the end result of a personnel action" cannot "receive relief that alters or compensates for the end result." *Babb*, 140 S. Ct. at 1177–78, "[P]laintiffs who demonstrate only that they were subjected to *unequal consideration* cannot obtain reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision." *Id*. (emphasis added). In such case, the employee may instead obtain "injunctive or other forward-looking relief," by showing that a protected characteristic was a but-for cause of some "differential treatment" in the employment-decision-making process. *Id*. To be part of the process, the differential treatment must play some "role in the final decision" (even if it did not affect the end result). *Id*. at 1174 n.3

In *Babb*, the Supreme Court provided two examples to illustrate how this analysis works. First, imagine a hypothetical position to be filled based strictly on numerical scores calculated by the applicable agency. *Babb*, 140 S. Ct. at 1174. The agency docks a particular applicant five points because of a protected characteristic (like age, race, or national origin), but hires or promotes him anyway because he still has the highest score. *Id*. That decision would not be "free from any discrimination," as required by section 2000e–16, because the employee was "treated differently (and less favorably)" based on a protected characteristic, even though the differential treatment did not affect the agency's final decision. *Id*.

Next, imagine a position to be filled at the subjective discretion of the hiring manager. *Babb*, 140 S. Ct. at 1174 n.3. The manager's subordinate recommends a particular candidate, telling the manager that his recommendation is based in part on a protected characteristic—such as the candidate's age, race, or national origin—but the manager "rebukes this subordinate for taking [the improper characteristic] into account, disregards the recommendation, and makes the decision independently." *Id*. That decision would be free from discrimination because the protected characteristic "played no role whatsoever in the ultimate decision." *Id*.

**B.    Summary judgment after *Babb*.**

Those are the ground rules for public-sector ADEA and Title VII discrimination claims after *Babb*. The question remains what proof is required to survive summary judgment on a discrimination claim under the new standard? Generally, a Title VII plaintiff may defeat summary judgment in two ways: (1) by establishing a prima facie case of discrimination through *McDonnell Douglas* burden shifting, or (2) by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Jenkins v. Nell*, 26 F.4th 1243, 1249–50 (11th Cir. 2022). We turn first to *McDonnell Douglas,* and its relationship with *Babb*.

37

To prevail under the *McDonnell Douglas* framework, a Title VII plaintiff must demonstrate that "(1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified to perform the job in question; and (4) his employer treated 'similarly situated' employees outside his class more favorably." *Jenkins*, 26 F.4th at 1249. But that's just the first step. If the plaintiff satisfies his initial burden—thus establishing a prima facie case of discrimination—the burden then shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the challenged action" (step two). *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018). If the defendant can do that, the burden then shifts back to the plaintiff to prove, finally, that the defendant's non-discriminatory reason was pretextual (step three). *Id*. That's how a plaintiff may avoid summary judgment on a Title VII discrimination claim under *McDonnell Douglas*.

This Court has noted, however, that *McDonnell Douglas* does not square with *Babb*. *See Babb*, 992 F.3d at 1204. The problem is that the burden-shifting framework presumes that a defendant isn't liable for discrimination that has no effect. *Id*. That's still true for private-sector Title VII plaintiffs, of course. A defendant may defeat plaintiff's claim under *McDonnell Douglas* by establishing a valid, non-discriminatory reason for the challenged action (step two), unless the plaintiff demonstrates, in turn, that the proffered reason was pretextual

(step three). Those latter steps are no longer relevant in public-sector cases, however, because *Babb* permits injunctive relief for certain discrimination whether or not it affected the ultimate personnel decision (so long as it played a role in the decision-making process). *See Babb*, 992 F.3d at 1204. As this Court noted on remand in *Babb*, "it seems that the Supreme Court accepted … that the district court should not have used the *McDonnell Douglas* framework," because "even when there are non-pretextual reasons for an adverse employment decision ... the presence of those reasons doesn't cancel out of the presence, and the taint, of discriminatory considerations." *Id.* (internal quotation marks and citation omitted). Thus, the second and third steps in the burden-shifting framework apparently no longer apply in public-sector cases. *See Lewis v. Sec'y of U.S. Air Force*, No. 20-12463, 2022 WL 2377164, at * 9–10 (11th Cir. June 30, 2022) (unpublished). The first step, however—establishing a prima facie case of discrimination—still seems to fit. *Id.*

We turn next to the convincing-mosaic standard. Whatever remains of *McDonnell Douglas* for public-sector Title VII plaintiffs after *Babb*, they may, in any event, defeat summary judgment by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Jenkins*, 26 F.4th at 1250. That typically means "pointing to evidence that demonstrates, among other things, (1)

suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Id.* (quoting *Lewis v. City of Union City*, *Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019)).

## C.    The similarly situated comparator.

A "similarly situated" employee must be "similarly situated [to the plaintiff] *in all material respects.*" *Lewis v. City of Union City*, *Ga.*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc, emphasis added). They "need not be … identical save for their race or gender," but a similarly-situated comparator ordinarily will have "engaged in the same basic conduct (or misconduct) as the plaintiff"; will have "been subject to the same employment policy, guideline, or rule as the plaintiff"; will have "been under the jurisdiction of the same supervisor as the plaintiff"; and will "share the plaintiff's employment or disciplinary history." *Id.* at 1227–28. "In short … a valid comparison will turn not on formal labels, but rather on *substantive likeness.*" *Id*. at 1228 (emphasis added). "[A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Id*. These prudent requirements "serve[] the interest of sound judicial administration by allowing for summary judgment in appropriate cases—namely, where the

comparators are simply too dissimilar to permit a valid inference that invidious discrimination is afoot." *Id.* at 1228–29. That's the case here.

When Rosado opposed summary judgment in the district court, he elected to proceed under the abridged *McDonnell Douglas* framework (step one), attempting to make a prima-facie showing of discrimination and retaliation for each claim. *See* Doc. 46 at 5–6, 9–25. The court analyzed his claims under that framework and correctly determined that he had not established a prima-facie case. *See* Doc. 58 at 17, 54. Rosado never attempted to identify a "convincing mosaic" of intentional discrimination (and no such evidence is apparent in the record). *See* Doc. 46 at 9–25.[8] Regardless, evidence of a "similarly situated" comparator is part of both the *McDonnell Douglas* framework and the convincing-mosaic standard. *See Jenkins*, 26 F.4th at 1249–50. A valid comparator is necessary to establish a prima-facie case under *McDonnell Douglas* (step one), and a linchpin of the prototypical convincing mosaic, as stated in *Jenkins*. *Id*. To this end, this Court has acknowledged that a similarly situated comparator remains important in public-sector cases, even after *Babb*. *See Lewis*, 2022 WL 2377164, at *10 ("[N]either *Babb I* nor *Babb II* suggested that the comparator analysis in *Lewis I* is inappropriate under the new

---

[8]The district court noted that Rosado's claims also would fail under the convincing-mosaic standard. *See* Doc. 58 at 18 n.6, 54.

standards."). In *Malone v. U.S. Att'y Gen.*, 858 F. App'x 296 (11th Cir. 2021),
for instance, this Court rejected a discrimination claim where there was no
basis to infer that the plaintiff was more qualified than other candidates,
because the plaintiff and the others were not sufficiently similar. *Id*. at 301. The
others had specific experience, education, or fluency that the plaintiff lacked.
*Id*. With no evidence of an otherwise similarly situated comparator of a
different race, the plaintiff could not demonstrate that "race played a part in
the way the decision was made," as *Babb* requires. *Id*.

Similarly, in *Troupe v. DeJoy*, 861 F. App'x 291, 294–95 (11th Cir. 2021),
this Court rejected plaintiff's discrimination claims under both *McDonnell
Douglas* and the convincing-mosaic standard, while acknowledging that
*McDonnell Douglas* "is not well suited" for public-sector Title VII claims after
*Babb*. Troupe had likewise "failed to identify an appropriate 'comparator'—
that is, another employee of a different race or color who was otherwise
'similarly situated' to her 'in all material respects' and who was treated more
favorably than she was." *Id*. at 294 (quoting *Lewis*, 918 F.3d at 1224). The
recent cases demonstrate that a similarly situated comparator remains no less
important for public-sector Title VII plaintiffs today than before *Babb*,
whichever standard of proof now applies on summary judgment. *Cf. Jones v.
City of Birmingham*, No. 21-12962, 2022 WL 4393344, at *2–3 (11th Cir. Sept.

42

23, 2022) (unpublished) (in private-sector case, rejecting discrimination claims under both *McDonnell Douglas* and the convincing-mosaic standard because there were material differences between plaintiff and the proposed comparator).

### D. There is no evidence that anyone treated Rosado differently than any similarly situated candidate for any available position.

The district court correctly granted summary judgment on Rosado's discrimination claims in light of *Babb, Lewis, Malone, Troupe,* and the other authority above. Summary judgment is appropriate because "evidence of discriminatory intent is totally lacking." *Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 601 (11th Cir. 1994). No material facts are in dispute, even when viewed in the light most favorable to Rosado. There is no evidence to support his claims; merely speculation and conjecture. *See Cincinnati Ins. Co. v. Metro. Props., Inc.,* 806 F.2d 1541, 1544 (11th Cir. 1986) (speculation and conjecture cannot defeat summary judgment). No reasonable juror could conclude that Rosado's race or age was a but-for cause of any differential treatment that played a role in the decision-making process for any position—as *Babb* requires—because Rosado does not identify an otherwise comparable (or less qualified) candidate, of any race or age, who was favored over him, in any way, at any step of the process. Put differently, the undisputed facts in this

43

record provide no basis to infer that Rosado would have been treated differently, in any way, had he been younger or of a different race or national origin.

Fleming was not similarly situated to Rosado in material respects because he possessed a crucial qualification that Rosado lacked: recent experience with operating systems. Fleming's resume reflected a bounty of recent operating-systems experience in his current position. *See* Doc. 51-7 at 1–4; Doc. 51-5; Doc. 51-5 ¶ 5. Rosado's resume, by contrast, indicated hardly any recent experience with operating systems. *See* Doc. 37-5, Doc. 47-11 at 2–3. He had worked in the telecommunications group for the previous seven years, focusing primarily on "cell phones and telephone networks." Doc. 51-1 ¶ 22. The selection committee awarded Fleming's resume an average score of 39.67 points (the highest of any eligible candidate) and awarded Rosado's resume just 28.99 points (11th best), following the pre-established criteria, primarily due to Fleming's recent operating-systems experience, which Rosado lacked. *See* Doc. 51-7 at 1–4 (Fleming's resume); Doc. 47-11 at 2–3 (Rosado's resume); 51-5 (scoresheet); Doc. 51-3 (criteria). Rosado points out that Fleming lacked industrial-control-systems experience (so did Rosado, according to his resume), *see* Rosado's brief at 44, but the scoresheet shows that that had no bearing on the selection because each committee member awarded

44

each candidate the same number of points in that category—either two points or none at all, *see* Doc. 51-5. Rosado does not dispute the resume scores, he does not dispute that Fleming's operating-systems experience set him apart regardless of ICS experience, and he does not identify any other putative comparator for position I. *See* Rosado's brief at 44. Unrebutted evidence shows that Fleming was selected because he possessed current operating-systems experience, which Rosado lacked. There is no evidence from which a jury could reasonably infer that Rosado's age or race was a but-for cause of differential treatment that played any role in the position-I selection process.

Snead and Joshua were not similarly situated to Rosado for a similar reason. They both had recent experience with networking and systems administration. *See* Doc. 52-4 (Snead's resume); Doc. 51-12 (Joshua's resume); Doc. 52-1 ¶¶ 19, 21 (declaration). Rosado did not. *See* Doc. 47-11 at 2–3 (Rosado's resume). Rosado does not dispute that Snead's and Joshua's *recent* experience set them apart. *See* Rosado's brief at 44–43 (Rosado arguing that he has "as much or more" networking and systems-administration experience in the past "40 years"). He mistakenly argues that Snead and Joshua were hired "due to their alleged qualifications related to [industrial control systems]," but unrebutted testimony makes clear that *none* of the available candidates had the ICS experience that the selection-committee chair had initially hoped to find

45

for position II. *See* Doc. 52-1 ¶¶ 19–23; Doc. 37-1 ¶¶ 38–40. Snead and Joshua were the only available candidates among the top ten. *See* Doc. 51-1 ¶ 18. Rosado also argues that the command information officer "chang[ed] the vacancy announcement" for position II to "indicate that only one position was open," but he does not explain why that's relevant. Rosado's brief at 43. He applied, was deemed eligible, and considered for *either* opening. Unrebutted evidence shows that Joshua and Snead were selected because they possessed current networking and system-administration experience, which Rosado lacked (regardless of how many openings had been advertised in the job posting). Rosado does not identify any other putative comparator for position II. *See* Rosado's brief at 42–47. There is no evidence from which a jury could reasonably infer that Rosado's age, race, or national origin was a but-for cause of differential treatment that played any role in the position-II selection process.

Ravenscroft was not similarly situated to Rosado because Ravenscroft was a disabled veteran eligible to be converted and promoted without competition. *See* Doc. 37-1 ¶ 24 (declaration); Doc. 51-8 at 1–2 (documentation of disability). The command information officer testified that she promoted Ravenscroft because (1) he had industrial-control-systems experience, and (2) she could promote him at her discretion, without soliciting other candidates.

46

*See* Doc. 37-1 ¶ 24. Rosado does not claim to have been eligible for non-competitive promotion, and he admits that Ravenscroft was. *See* Rosado's brief at 28 n.6. Thus, Ravenscroft would not be similarly situated to Rosado even if their qualifications were otherwise identical. It makes no difference who had more industrial-control-systems experience. (The command information officer had no way to know of Rosado's purported ICS experience because it was not on his resume. *See* 47-11 at 2–5, Doc. 51-1 ¶ 15; *cf.* Doc. 47-7 at 2.) Unrebutted evidence shows that Ravenscroft was promoted because he had industrial-control-systems experience *and* was eligible for non-competitive promotion (which Rosado was not). Rosado does not identify any other putative comparator for position III. *See* Rosado's brief at 42–47. There is no evidence from which a jury could reasonably infer that Rosado's age, race, or national origin was a but-for cause of differential treatment that played any role in the position-III selection process.

Rosado makes no attempt to identify a comparator for position IV (the "temporary promotion"). To establish a prima facie case of discrimination on this count, Rosado would need to identify—at a minimum—either (1) another employee who received a raise after being "temporarily promoted," via detail, by the division director, or (2) another employee selected *over Rosado* for a true temporary promotion. He identifies neither. The division director had no

power to promote or award raises (only to grant detail assignments). *See* Doc. 35-1 at 12; Doc. 51-1 ¶¶ 25–26. And the command information officer could not have selected anyone "over" Rosado because Rosado declined her offer. *See* Doc. 36-1 at 35 (Rosado's deposition). Unrebutted evidence shows that (1) the division director offered Rosado either something beyond his power to provide (a true temporary promotion with a raise), or just what Rosado received (a detail assignment), and, in any event, (2) the command information officer then offered Rosado a true temporary promotion, which he rejected. Given the lack of any similarly situated comparator, again, there is no evidence from which a jury could reasonably infer that Rosado's age, race, or national origin was a but-for cause of differential treatment that played a role in any process relating to position IV. Regardless, Rosado has abandoned this discrimination claim by failing to address it in his brief. *See* Rosado's brief (arguing that the command information officer's purported refusal to pay him for performing temporary duties was retaliation, *id.* at 48, but not discrimination, *id.* at 36–47).

Finally, Joshua was not similarly situated to Rosado for the supervisory job (position V) because Joshua had recent management experience in the Command Information Office, which Rosado lacked. First, Joshua served as the temporary director of the information-systems division, supervising eleven

employees, for nearly four months. *See* Doc. 51-1 ¶ 34 (declaration); Doc. 37-5 (org chart). Second, Joshua had project management experience overseeing laptop refreshes, network migrations, and Windows upgrades "for the entire command." Doc. 51-1 ¶ 36. The selection panel thus awarded Joshua's resume an average of 4.33 points out of 5 for management experience, contributing to his fifth-highest overall resume score. *See* Doc. 52-6 at 1–2, 6. Rosado's resume reflected no such recent experience, was awarded just 2.33 points for management experience, and was ranked the 12th best overall. *See* Doc. 52-6 at 1, 6. Rosado does not dispute any of this (although he alludes to his "14 years of supervisory experience" decades ago in the Marines and to purported supervisory experience not on his resume). *See* Rosado's brief at 43. Thus, Joshua was not similarly situated to Rosado, even putting aside Joshua's superior interview, which distinguished him further. *See* Doc. 52-6 at 4, 6 (scoresheet); Doc. 53-4 at 6–7 (declaration); Doc. 53-5 at 6–7 (declaration). Unrebutted evidence shows that the selection panel recommended Joshua for this *supervisory* position largely because he had significant recent management experience, which Rosado lacked (and, relatedly, because Joshua interviewed better than any other candidate). Rosado does not identify any other putative comparator for position V; that is, no one else who was treated differently than him in any way during the selection process. *See* Rosado's brief at 42–47.

49

There is no evidence from which a jury could reasonably infer that Rosado's age, race, or national origin was a but-for cause of differential treatment that played any role in the position-V selection process.

*    *    *

Rosado's discrimination claims boil down to his subjective belief that "he had experience and qualifications equal to or greater than the selectees." Rosado's brief at 43. Whatever his qualifications, Rosado cannot dispute that his resumes failed to convey the determinative ones that the selection committee or selecting official had prioritized for positions I, II, and V—*recent* experience with operating systems, networking, systems administration, or management. And he does not contend that he was eligible for non-competitive promotion (position III), nor that anyone else obtained the type of temporary promotion that he declined, or received a raise for the type of detail that he accepted (position IV).

Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). That is just what Rosado seeks—judicial second-guessing of the Navy's personnel needs. An employee should not be able to leverage nuisance settlements or promotions through unfounded complaints of discrimination. *Cf. Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1270 (11th

50

Cir. 2010) ("Title VII's anti-retaliation provisions do not allow employees ... to insulate themselves against termination or discipline by preemptively making a discrimination complaint."). The summary judgment mechanism appropriately helps to avoid that threat here. No material facts are in dispute given the disconnect between Rosado's resumes and the determinative qualifications for each position. No jury could reasonably conclude that Rosado's race, national origin, or age was a but-for cause that played any role in the selection process for any position, as *Babb* requires for public-sector Title VII and ADEA claims.[9] The district court correctly granted summary judgment for the Secretary on the discrimination claims (Counts I–V, XI–XV).

## II. No reasonable juror could find that anyone in the Command Information Office retaliated against Rosado, because there is no evidence that his EEO complaints were a but-for cause of differential treatment that played a role in the decision-making process for any selection.

Rosado also claims that various people in the Command Information Office retaliated against him for opposing discrimination. *See* Doc. 5 (Counts

---

[9]Even if Rosado could identify an otherwise similarly situated comparator of a different race, national origin, or age who was somehow treated differently at some step of the process, summary judgment would still be appropriate on Rosado's claims for compensatory damages. A plaintiff who "cannot show that discrimination was a but-for cause of the end result of a personnel action" can only obtain injunctive relief. *Babb*, 140 S. Ct. at 1177–78.

VI–X, XVI–XVIII). The Supreme Court has not addressed whether a federal employee may bring a retaliation claim under Title VII. *See, e.g., Green v. Brennan*, 578 U.S. 547, 551 n.1 (2016) (assuming without deciding that it is unlawful for a federal agency to retaliate against a civil servant for complaining of discrimination). But this Court has long recognized federal-sector retaliation claims, even though Title VII does not explicitly provide for them (as it does for private-sector employees). *See Tonkyro*, 995 F.3d at 835 (noting that public-sector retaliation claims arise from section 2000e–16(a) rather than section 2000e–3(a)).

*Babb* applies here, too. In *Trask v. Dep't of Veterans Affairs*, 822 F.3d 1179, 1194–95 (11th Cir. 2016) (abrogated as explained below), this Court held that "to establish a prima facie case of retaliation, plaintiffs must prove that (1) they engaged in statutorily protected conduct; (2) they suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." On remand in *Babb*, however, this Court held that the causation standard articulated by the Supreme Court applies with equal force to Title VII retaliation claims, thus abrogating *Trask*. *See Babb*, 992 F.3d at 1200–05 (vacating and remanding for district court to apply *Babb* causation standard to plaintiff's Title VII retaliation claim). Applying *Babb*, a retaliation plaintiff can now obtain monetary damages by proving that statutorily-

52

protected conduct was a but-for cause of an adverse employment action, or injunctive relief by proving that statutorily-protected conduct was a but-for cause of differential treatment that played a role in an adverse employment action. *Cf. Babb*, 140 S. Ct. at 1171–78 (discussed above).

The district court correctly found no evidence from which a jury could reasonably infer a causal connection between (1) Rosado's statutorily protected activity—his EEO complaints—and (2) any adverse employment action or differential treatment that played a role in such action. *See* Doc. 58 at 28, 31, 40, 43–45, 51. On appeal, Rosado does not argue that any aspect of the selection processes for positions I, II, III or V were retaliatory. *See* Rosado's brief at 47–52. He has therefore abandoned these claims. *See Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 681–83 (11th Cir. 2014) (appellant abandons a claim when he does not "plainly and prominently" raise it in his opening brief). He now argues that the command information retaliated against him solely in connection with the "temporary promotion" (position IV). *Id.* Nevertheless, we will explain why the district court correctly granted summary judgment on each retaliation claim.

Absent direct evidence of retaliatory intent, a "causal connection" may be inferred if "the decision maker was aware of the protected conduct at the time of the adverse employment action" and there was "close temporal

proximity between the employee's protected conduct and [1] the adverse

employment action" (or [2] differential treatment that played a role in the

adverse employment action). *Brungart v. BellSouth Telecommunications, Inc.*, 231

F.3d 791, 799 (11th Cir. 2000). But the "temporal relationship between the

protected activity and the adverse employment action must be '*very close*.'"

*Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010)

(emphasis added, quoting *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364

(11th Cir. 2008)). Rosado's protected activities and the other relevant events in

this case occurred at the following times:

| 2011 | First EEO complaint. *See* Doc. 38-2 at 2 |
|---|---|
| Aug. 2014 | Rosado not recommended for position I. Doc. 51-6 at 1. |
| Nov. or Dec. 2014 | Command information officer decides to non-competitively promote Ravenscroft (position III). Doc. 37-1 ¶¶. |
| Dec. 10, 2014 | Second EEO complaint (re: position I). Doc. 38-3. |
| "Late December 2014 or early January 2015" | Rosado's resume not selected by division director when pre-screening position-II candidates. Doc. 52-1 ¶ 14. |
| Apr. 1, 2015 | Command information officer collectively admonishes staff that "if you don't want to work, the door is open for you to leave," and invites them to speak with the EEO or union ("I'm not afraid of the EEO or the union if anyone wants to get them involved," because "they will understand that I am not asking anyone to work outside the scope of their PD."). Doc. 37-1 ¶ 44; Doc. 36-1 at 20. |
| Apr. 13, 2015 | Third EEO complaint (re: position II). Doc. 47-4. |
| Aug. 2015 | Division director offers Rosado detail assignment, which he accepts, and command information officer offers rosado a temporary promotion, which he declines (position IV). Doc. 35-1 at 11–12. |

| Jan. 2018 | Rosado not selected for position V. Doc. 52-6 at 5. |
| Mar. 19, 2018 | Fourth EEO complaint (re: position V). Doc. 38-4. |

No causal connection may be inferred between protected activities and any aspect of the selection process for positions I, III, IV, or V because those selections were not in "close temporal proximity" to any EEO complaint. This Court has held that a three-month gap "between a protected activity and an adverse employment action is insufficient to create a jury issue on causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (2006); *see also Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (three-and-a-half-month gap insufficient), *Brown*, 597 F.3d at 1182 ("a three-month interval between the protected expression and the employment action … is too long" to support a causal connection). It had been three years since Rosado's first EEO complaint when the selection committee decided not to recommend him for position I, and when the command information officer decided to promote Ravenscroft into position III. It had been about four months since Rosado's third EEO complaint when his director offered to detail him and the command information officer offered to temporarily promote him (position IV). And it had been nine months since that same complaint when Rosado was not selected for position V. (See above.)

Rosado's retaliation claim for position II is less clear because the division director decided not to refer his resume to the selection committee in late

55

December 2014 or early January 2015, just a few weeks after Rosado had filed his second EEO complaint. And the command information officer admitted telling her staff "I'm not afraid of the EEO" on April 1, 2015. (See above.) Still, we do not believe a causal inference is reasonably supported on these facts.

First, Rosado no longer argues that his non-selection for position II was retaliatory. *See* Rosado's brief at 49–52 (arguing that the command information officer retaliated against him by failing to honor or process his "temporary promotion"—position IV). He has thus abandoned this claim. *See Sapuppo*, 739 F.3d at 681–83.

Second, there is no evidence that the director was aware of Rosado's most recent EEO complaint when he decided not to refer his resume for position II. The director testified that he was aware of Rosado's first EEO complaint and had even been "a witness for Mr. Rosado" in that case (years earlier). Doc. 51-1 ¶ 4. But Rosado points to no evidence that the director knew of his most recent EEO complaint. And even if the director knew, there would be no basis to infer that he retaliated against Rosado. The director "was not the object of any of Rosado's prior complaints"; to the contrary, he had previously testified on Rosado's behalf, as the district court noted. Doc. 58 at 40–41. "Unlawful discrimination is intolerable, and those who engage in it

56

should be held to account." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1058 (11th Cir. 2020) "But inference in favor of a plaintiff can be based only on evidence—not on speculation." *Id.*

Third, Rosado admits that when the command information officer told the staff "I'm not afraid of the EEO," she was admonishing them because Fleming had refused to perform a requested task (shipping something to Cuba). *See* Doc. 36-1 at 20–21 (Rosado's deposition). In context, her statement was an invitation to raise scope-of-duty complaints with the EEO or the union. *See* Doc. 37-1 ¶ 44; Doc. 35-1 at 5. It had nothing to do with discrimination, by Rosado's admission.

In sum, there is no evidence of any causal connection between Rosado's EEO complaints and any aspect of the selection process for any position. And Rosado has abandoned most of his retaliation claims, regardless. The district court correctly granted summary judgment for the Secretary on the retaliation claims (Counts VI–X, XVI–XVIII).

# Conclusion

The Secretary requests that this Court affirm the judgment of the district court.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

MICHELLE THRESHER TAYLOR
Assistant United States Attorney
Appellate Division

By:    *s/ Sean Siekkinen*
SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
sean.siekkinen@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 12,923 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B).

# Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was

sent by CM/ECF on June 27, 2023, to:

ARCHIBALD J. THOMAS, III, ESQ.
*Counsel for Jose Rosado*

*s/ Sean Siekkinen*
SEAN SIEKKINEN
Assistant United States Attorney

Gkpr/no/6-14-23